**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **FREEMAN & ASSOCIATES, INC.,** | : |
| **Plaintiff** | : |
| v. | :   5:05-CV-34 (WDO) |
| **TRAVELERS CASUALTY & SURETY COMPANY OF AMERICA,** | : |
| **Defendant** | : |

**ORDER**

On September 25, 2002, Plaintiff Freeman & Associates ("Freeman"), a general contractor, was awarded a contract by the Georgia State Financing and Investment Commission to construct a building known as "Building 'I' Central Georgia Technical College" (the "project"). On October 28, 2002, Freeman awarded a subcontract for the electrical portion of the work to Allgood Electric Company ("Allgood"), an electrical subcontractor. Allgood obtained a performance and payment bond from Defendant Travelers Casualty & Surety Company of America (the "surety"). Allgood and the surety executed the bonds with Allgood as principal, Travelers as surety and Freeman as obligee. The bonds are for $766,000.00, the total amount of the Allgood subcontract. The performance bond assured Freeman that Allgood would perform the subcontract by completing the electrical work on time, in accordance with the contract documents and for the contract price. Specifically, the payment bond provided:

1

- the surety agreed that no change, extension of time, alteration, addition, omission or other modification of the terms of either the subcontract or the prime contract, or terms regarding the work to be performed, the specifications or the plans, would in any way affect the surety's obligation on the bond;

- the surety waived notice of any changes, extensions of time, alterations, additions, omissions or other modifications; and

- Allgood and the surety agreed that the bond inured to the benefit of all persons supplying labor and material for the contract and that such persons may maintain independent actions upon the bond in their own names.[1]

The performance bond provided that if Allgood performed the subcontract as provided for in the contract and indemnified and held Freeman harmless from any and all losses that Freeman might sustain by Allgood's failure to perform, the bond would be null and void. Otherwise, the bond remained in full force and effect. The surety again agreed that no changes, extensions of time, alterations, additions, omissions or other modifications of the terms of either the subcontract or prime contract would affect its obligations on the bond and waived notice of any such changes.[2] The performance bond incorporated by reference the electrical subcontract because it is the terms and obligations of that specific agreement which were bonded by the surety. The subcontract terms included Freeman's obligations to pay Allgood and also included a "trust term" which imposed upon all contract balances a "trust"

---

[1] Ex. A to Compl.

[2] Ex. B to Compl.

in favor of the suppliers and subcontractors.

Allgood started work on the project in January of 2003 and initially performed its work satisfactorily but it was soon obvious that Allgood was in financial difficulty. Allgood had to make arrangements for its contract payments to be paid to its bank, CB&T, and checks co-payable to suppliers were often required.[3] On January 28, 2003, Freeman entered into a three-party agreement with Allgood and CB&T to ensure that Allgood's income would be used to pay Allgood's obligations. The surety argues this was in contravention of the contracts between it, Freeman and Allgood. Freeman contends the language quoted above from the bonds waived any objection by the surety to this agreement or at least provided consent in advance to changes, alterations, modifications and additions to the contracts. In December of 2003, Allgood advised Freeman it would not be able to make payroll so Freeman advanced funds to Allgood to cover payroll, thus enabling employees who were familiar with the job to continue working on the project.[4] Freeman and Allgood gave immediate notice to Allgood's surety of the situation. The surety initially approved the procedure but thereafter objected.

CB&T issued a $250,000 line of credit to Allgood for this project. The monthly payments on the line of credit were $10,000 in principal plus accrued interest. Between May 28 and November 24, 2003, Freeman issued ten checks jointly payable to CB&T and Allgood in the total amount of $272,731.06. Three of the checks were also made payable to

---

[3]Haralson Dep. at 97.

[4]Haralson Dep. at 342.

Lowe Electric, an Allgood supplier. When Allgood presented joint checks, CB&T would retain such funds as were necessary to pay Allgood's line of credit on this project. Additional funds were deposited into Allgood's checking account or Allgood's payroll account[5] On September 16, 2003, all of Allgood's debts to CB&T were consolidated into one loan.

In January of 2004, Freeman asked Allgood to provide it with a list of all of Allgood's unpaid subcontractors and suppliers on the project and the amounts owed to them. Allgood complied and its list demonstrated how certain project money had gone through CB&T rather than directly to suppliers and subcontractors. The total amount of unpaid project obligations was $191,197.74. To these amounts must be added an additional $16,183.40 for an Allgood subcontractor whose amount did not appear on the January 2004 list. Thus, the total amount of unpaid obligations for Allgood as of January 2004 was $207,381.14. In January of 2004, Freeman paid all of Allgood's subcontractors, suppliers and has claimed this amount as a credit against the Allgood subcontract price of $766,000.00.

Allgood's contract was terminated on January 29, 2004 and another electrical company, Smith-Gray, was hired to complete the project. Freeman thereafter completed the entire project without default of its obligations. However, Freeman contends that, as a result of Allgood's default, it suffered losses totaling $462,483.69 as of August 31, 2004. Freeman seeks to recover from Defendant Travelers, the surety, these losses with interest from that

---

[5]Pl.'s Resp. to Def.'s Summ. J. Mot. (Doc. 29-11) and Doc. 33.

date.  Freeman seeks the difference between what it paid Smith-Gray and others to complete the electrical work and the remaining, unpaid Allgood subcontract balance.  The surety contends these alleged damages were exacerbated by Freeman entering into the three-party agreement with CB&T because the surety believes that part of the money went to non-contract obligations.  Freeman denies that any money went to obligations outside of this project.  Freeman does concede that, of all the money paid from Freeman to Allgood or to Allgood through CB&T, $58,377.24 was retained by CB&T and applied to Allgood's loans.  The record shows that of that amount some of it was likely paid on the previous loans, or the consolidated loan.  Freeman maintains however that the remainder of the funds represented by the joint checks were either deposited into Allgood's accounts or paid to Lowe Electric in connection with  this project.

Summary Judgment is appropriate when the pleadings, depositions and affidavits submitted by the parties show no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The Supreme Court has explained that the moving party's burden may be discharged "by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  In Celotex, the Court held that summary judgment is appropriate against

> A party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts

5

> immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

Id. at 322-23. "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact." Chapman v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000). "Summary judgment . . . is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Celotex, 477 U.S. at 327 (citing Fed. R. Civ. P. 1; Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 467 (1984)). Ordinarily, the liability of a surety on a bond which is plain and unambiguous is governed, like any other contract, by the intention of the parties as expressed in the instrument, the construction and interpretation of which is matter of law for the court. Sim's Crane Serv., Inc. v. Reliance Ins. Co., 514 F. Supp. 1033, 1036 (D.C. Ga. 1981). Therefore, a surety contract is properly subject to disposition by summary judgment if the contract is not ambiguous. Id.

Pursuant to Georgia law,

> The contract of suretyship or guaranty is one whereby a person obligates himself to pay the debt of another in consideration of a benefit flowing to the surety or in consideration of credit . . . given to his principal, the principal in either instance remaining bound therefor. Sureties, including those formerly called guarantors, are jointly and severally liable with their principal unless the contract provides otherwise. There shall be no distinction between contracts of suretyship and guaranty.

6

O.C.G.A. 10-7-1. Any act of a creditor which increases a surety's risk or exposes the surety to greater liability discharges the surety. O.C.G.A. § 10-7-22. Interpreting this statute, the Georgia Court of Appeals found in one case that, when a bank advanced funds under the project loan and applied them to other debts the company owed the bank to prevent default on the other loans, the surety was not discharged because the contracts in question permitted the bank to use the money as it did. Underwood v. NationsBanc Real Estate Serv., Inc., 471 S.E.2d 291, 293 (Ga. App. 1996). The language of the guaranty note specifically contemplated an increase in the company's debt and the creation of new obligations, and it included waivers of any "legal or equitable discharge" and of any defense based upon an increase in risk. Id. In an earlier case, the Georgia Court of Appeals addressed a situation where an owner paid subcontractors, laborers and materialmen to prevent a lien being filed on the building and later sought to recover from the surety. Peachtree Roxboro Corp. v. United States Cas. Co., 114 S.E.2d 49 (Ga. App. 1960). The court held,

> Even if the payment by the plaintiff of the guaranteed contract price, before the payment to laborers and materialmen was improper . . . , the defendant casualty company is required to show that its risk was increased thereby in order to receive a discharge from its obligations under the bond. A compensated surety is not a favorite of the law. A departure from the terms of a construction contract must be such as to prejudice a paid surety before it may be discharged.

Id. at 53. "Judge Posner has pointed out, 'whether the advances increase the surety's risk depends on what the principal did with them; if he used them on the project the amount at risk to the surety may be unaffected.' In other words, a material modification to a contract is not the same as a modification that materially increases the surety's risk." Mergentime

Corp. v. Washington Metropo. Area, 775 F. Supp. 14, 19 (D.D.C. 1991) (citing Argonaut Ins. Co. v. Town of Cloverdale, 699 F.2d 417, 419 (7th Cir.1983)).  Pursuant to the Restatement of Security, "Where, without the surety's consent, the principal and creditor modify their contract otherwise than by extension of time of payment, the compensated surety is (i) discharged if the modification materially increases his risk and (ii) not discharged if the risk is not materially increased, but his obligation is reduced to the extent of loss due to the modification."  Mergentime, 775 F. Supp. at 20.  In Mergentime, the parties adjusted their performance and payment schedules to keep Mergentime on the job to "increase its efficiency in performing the work on the two projects" and "to resolve some outstanding disputes arising from delays in performance."  Id. at 21.  The court found no prejudice to the surety and therefore did not permit a complete discharge of the surety's obligations but granted a discharge to the extent of the surety's prejudice.

"[U]nder the common law a surety was considered to be a favorite of the law and even minor changes in, or departures from, the principal contract were held to discharge the surety."  Gibbs v. Hartford Acc. & Indem. Co., 62 So.2d 599, 601 (Fla. 1953).  This strict interpretation of the law however "has been discarded by most American Courts" because "in olden days a compensated surety was almost unknown.  Consequently, the law was lenient toward and inclined to favor a surety who was an accommodation party."  Id.  See also Houston Gen. Ins. Co. v. Brock Const. Co., Inc., 246 S.E.2d 316, 319 (Ga. 1978) ("The holding that the rule of "strict law" . . . does not apply to compensated sureties is a correct determination of the common law, and we affirm it.")

However, along about the turn of the century, individuals, and later corporations formed for profit, began the business of becoming compensated sureties. Because of such mutation it became advisable, if not necessary, to change the philosophy of the law in order to keep pace with ever-changing conditions and thereby accomplish substantial justice.

There is a lack of unanimity of opinion, however, among the courts of today with reference to the question what conditions and circumstances attendant upon premature payment to the contractor will discharge the surety upon the latter's performance bond. Some courts hold to the out-moded view that a premature payment amounts under any and all circumstances to such departure from the contract as will operate to release and discharge the surety in toto. Such courts customarily reach this conclusion upon two premises: (1) that if payments are not made to the contractor in accordance with the terms of the construction contract the fund to which the surety would otherwise be entitled, should the contractor default, would be beyond reach and consequently lost to the surety to his injury; (2) that a construction contract which provides that the owner shall retain the finds in his hands until the contractor has fulfilled his obligations operates as an incentive to said contractor to complete and fulfill the contract in accordance with his obligations thereunder in order that he may receive these funds. It is likewise suggested that 'The greater amount so retained the stronger the incentive.'

. . .

There are courts which have modified the common-law rule by holding that if there is a material, possibly substantial, departure from the construction contract the surety will be wholly exonerated. Other courts, which we believe enunciate the rule compatible with substantial justice, hold that prepayments such as the record shows were made in this case do not discharge a compensated surety except in those instances where it may appear that such departure from the terms of the construction contract resulted in injury or prejudice to the surety, and then only to the extent of such injury.

It is more than difficult for us to understand why a compensated surety should be discharged from the obligation of the performance bond if in fact said surety has sustained no injury as the result of premature payments to the contractor. Nor can we see wherein the surety is injured or prejudiced if . . . all of the money advanced . . . was actually used in the construction of the subject [building project]. Of course, [the one seeking to recover from the surety] should be required to prove not only that all of the money went into the

9

> construction of the [project] but that the [building] was constructed in accordance with the original plans and specifications, except, of course, changes made as permitted by the contract. Moreover, the burden should be placed upon him to show that the cost of materials and the charges for labor were the usual, customary and prevailing, costs of materials and wages for labor during the period of construction.
>
> . . .
>
> When, as here, it appears that the contractor was in distress almost at the beginning of the contract; that he was able to continue work only because of the premature payments made by the owner, but the work was not properly done or the job completed in accordance with the contract, resulting in a very heavy loss to someone, and there is no practical way to determine with any degree of accuracy what course the surety would have pursued had it been given notice of the situation, or what the result of that course would have been, under such circumstance damage to the surety will be presumed and the owner will not be heard to try to show that no loss was suffered by the surety.

Gibbs, 62 So.2d at 601-602. "[C]onsiderations of justice are fully met when the surety is recouped to the extent of the losses actually sustained by reason of misconduct on the part of the indemnified." Id. at 604.

An example of when a court found a surety's risk was increased was in Elfinwild Volunteer Fire Dpt. v. Int'l Fid. Ins., 530 F. Supp. 111 (W.D. Penn. 1982). In that case, the parties contracted for the manufacture of a custom pumper firetruck. The contract required no downpayment and for the total price to be paid cash on delivery for a cost of $90,933. At the manufacturer's urging, the fire department made a payment of $50,000 prior to delivery of the truck. An employee of the manufacturer then absconded with the money and Hamerly, the manufacturer, thereafter closed its business without delivering the firetruck. The court found the advance payment substantially increased the chances of loss due to a default or

10

insolvency of the manufacturer which was insured by a surety.

> When IFIC [the surety] initially reviewed its risks as a surety for the contract, payment to Hamerly was to be made in full only upon delivery of the firetruck in final form and in accordance with the specifications. Hamerly was provided with an incentive to complete the construction and deliver the firetruck, if it wanted to be compensated for its efforts. Because Elfinwild changed the method of compensation by advancing $50,000 to Hamerly, prior to the completion and delivery of the truck and contrary to the terms of the purchase agreement, the incentive for Hamerly to finish the work was diminished, thereby substantially increasing the likelihood of the work being abandoned prior to completion when Hamerly became insolvent.
>
> Since the advance payment removed the incentive for Hamerly to complete the work in order to receive payment and therefore increased the risk of non-performance, the surety is released to the extent of said $50,000. IFIC should not be subjected to a risk which is materially and adversely different from the risk it undertook to guarantee in the first instance. Defendant, IFIC is therefore discharged from liability only in the amount of $50,000, which is the amount by which it was prejudiced due to the improper advance payment to Hamerly.

Id. at 113.

In a case from the former Fifth Circuit, the court addressed how to assess damages or determine the extent to which a surety should be discharged when another party acts to the surety's detriment. United States v. Cont'l Cas. Co., 512 F.2d 475 (5th Cir. 1975). The court explained, "any act by the creditor depriving the surety of [its rights] discharges it pro tanto; thus, the creditor must, for the surety's benefit, apply to the debt all money or security within his control and which he has a right to apply. If he voluntarily surrenders or releases such security, the surety is discharged pro tanto." Id. at 478 (citations omitted). See also Brunswick Nursing & Convalescent Center, Inc. v. Great American Ins. Co., 308 F. Supp. 297 (D.C. Ga. 1970) (district court denied surety's summary judgment motion and predicted

that a discharge, if granted, would be in full and not pro tanto because of kickback payments made that increased surety's risk). "Of course, the creditor will not always be able to prevent loss to the surety; nevertheless, it must act in good faith and not unreasonably prejudice the surety's right to subrogation." Cont'l Cas. Co., 512 F.2d at 478. (citations omitted). In Continental Casualty, after one of the contractors defaulted, the government granted a subcontractor a reprocurement contract that ignored the payments that had already been made to the general contractor for purchase of the same equipment. The government essentially abandoned its claim to title in the equipment and paid for it a second time. The court found that this "not only obligated the surety to pay the full amount of the bond, but concurrently destroyed its right to be subrogated to the title the Corps held in the hoists at the time of reprocurement. The surety could not now proceed . . . to replevy the partially completed – and partially paid for – hoists. The surety had to be given some way to protect its right to be subrogated to the title of the Corps in the hoists at the date of termination, and the reprocurement contract effectively destroyed that right." Id. at 478. The court noted the government could have initiated litigation to determine title to the hoists for which it had already paid and while the suit was pending it could have entered into the reprocurement contract and later demanded payment of the bond by Continental. Id. "After paying the bond, Continental would have been subrogated to any right the Corps was eventually determined to have had in the partially completed equipment." Id. "Balancing the equities of the two parties," the court found that the scales tipped in favor of the surety because the "government has great discretion in the administration of its contracts, and its interest in their

timely completion is entitled to great weight." Id. (citation omitted). "Here, however, the government could have protected this interest without destroying the surety's extremely valuable subrogation right; its action here constituted an abuse of discretion, and released the surety pro tanto." Id.

In the case at bar, the Court must determine whether Freeman & Associates materially changed or violated the terms of the contracts in question so as to increase to the surety's risk or expose the surety to greater liability. If Freeman did, the Court must then determine if that change or violation warrants granting Travelers, the surety, a full or partial discharge from its obligations on the bonds. As clearly shown from the contracts, the surety consented to changes, alterations and modifications of the contract *and* waived any right to notice thereof. The surety contends it did not *mean* to consent to what happened in this case - the three-party payment agreement between Freeman, Allgood and CB&T. However, the clear, unambiguous language of the bonds shows the surety did in fact consent to *any* changes, waived its right to notice of the changes and agreed to be held liable for Allgood's default. The surety could have written the bond contracts so that it would have been discharged if the parties entered into a payment agreement such as the one between Freeman, Allgood and CB&T, but it did not. Therefore, the relevant inquiry now is whether the three-party agreement increased the surety's risk such that it should be discharged in part or in full.

As in Peachtree Roxboro Corp., *supra*, Freeman & Associates, when it entered in the three-party agreement, did so to protect the assets of the project and to keep the project on time and on budget to the extent possible. Further, the advances made were in large part used

13

on the project in question. Therefore, even if it was construed to be a material modification of the original contract, it was not a modification that materially increased the surety's risk. Rather, Freeman sought to increase its efficiency in performing the work on the projects while avoiding possible delays in performance due to Allgood's anticipated default. The strict interpretation of the law the surety seeks to have applied in this case, that any change to the contract completely discharges its obligations, has been discarded by a majority of the courts in this country.

Although the surety's risk was not increased by the three-party agreement, the uncertainty over whether a portion of the proceeds from the agreement went to Allgood's loans from other projects requires the court to consider a partial discharge. Freeman was unable to show that *all* of the Freeman-Allgood-CB&T funds were actually used on this project. CB&T's records indicate that approximately $58,000 may have been applied to partially pay for loans on this project and to partially pay on previous loans. Freeman thus surrendered part of the security on the bonds and the surety should be discharged based on the amount of security placed at risk. Accordingly, the surety, Defendant Travelers, is ordered to fulfill its obligations on the bonds minus $58,377.24 representing what was retained by CB&T and applied to Allgood's loans to CB&T.

Defendant's motion for summary judgment is granted in part and denied in part and summary judgment is granted in part for Plaintiff.

**SO ORDERED this 23rd day of August, 2006.**

**S/**
**WILBUR D. OWENS, JR.**
**UNITED STATES DISTRICT JUDGE**